UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

TYRONE STURGEON,                           Case No. 1:12-cv-833
        Plaintiff,                         Beckwith, J.
                                           Litkovitz, M.J.
    vs.


COMMISSIONER OF                            **REPORT AND**
SOCIAL SECURITY,                           **RECOMMENDATION**
        Defendant.


Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final

decision of the Commissioner of Social Security (Commissioner) denying plaintiff's application

for supplemental security income (SSI).  This matter is before the Court on plaintiff's Statement

of Errors (Doc. 14), and the Commissioner's response in opposition (Doc. 19).

**I.  Procedural Background**

Plaintiff filed an application for SSI in March of 2004, alleging disability since May 22,

2003, due to a bulging disc and pinched nerve in his back, degenerative disc disease, and bi-polar

disorder.  Following a hearing before ALJ Ronald T. Jordan, plaintiff's application was denied at

the administrative level.  Plaintiff appealed the Commissioner's decision to the district court.

*See Sturgeon v. Commissioner*, Case No. 1:08-cv-510.  The district court issued a remand order

on July 6, 2009, directing the Commissioner to: (1) apply the correct legal standard when

evaluating the functional assessment and opinion of plaintiff's treating psychiatrist, Dr. Jonathan

Rosenthal, M.D., and when determining plaintiff's residual functional capacity (RFC), and

resolve any issues regarding plaintiff's alleged onset date of disability and duration thereof; and

(2) consider the December 2006 MRI evidence and Dr. Rosenthal's January 2007 recorded

statements.  (*Id.*, Docs. 15, 16).

While ALJ Jordan's decision on the initial application was pending before the Appeals Council, plaintiff filed a second application for SSI. The second application was pending at the hearing level when the initial case was remanded by the district court on July 6, 2009. The agency dismissed plaintiff's request for hearing on the second application on July 31, 2009, and all documentation submitted with that application was merged with the prior file.

A *de novo* hearing on the merged application was held on March 17, 2010, before ALJ Deborah Smith. (Tr. 1455-1526). Plaintiff was present with new counsel, who is representing plaintiff in this appeal. Two medical experts (MEs) and a vocational expert (VE) appeared and testified at the ALJ hearing. On April 15, 2010, the ALJ issued a decision denying plaintiff's SSI application. (Tr. 864-83). Plaintiff's request for review by the Appeals Council was denied, making the decision of the ALJ the final administrative decision of the Commissioner.

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382(a). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 1382c(a)(3)(B).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2

2) If the claimant does not have a severe medically determinable physical or mental impairment - *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities - the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 652 (6th Cir. 2009) (citing §§ 404.1520(a)(4)(i)-

(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four steps of the

sequential evaluation process. *Id.; Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 548 (6th Cir.

2004). Once the claimant establishes a prima facie case by showing an inability to perform the

relevant previous employment, the burden shifts to the Commissioner to show that the claimant

can perform other substantial gainful employment and that such employment exists in the

national economy. *Rabbers,* 582 F.3d at 652; *Harmon v. Apfel,* 168 F.3d 289, 291 (6th Cir.

1999).

### B. The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of

fact and conclusions of law:

1. The [plaintiff] has not engaged in substantial gainful activity since March 23, 2004, the application date (20 CFR 416.971 *et seq.*) although records submitted after the hearing suggest the [plaintiff] began to work full time in mid 2009 [Tr. 1439-54]. The [ALJ proceeded] with the sequential evaluation.

2. The [plaintiff] has the following severe impairments: degenerative disc disease and a history of remote left knee surgery, severe in combination; mood disorder/bipolar disorder, estimated borderline to low average intelligence, and a history of polysubstance abuse and drug-seeking behavior (20 CFR 416.920(c)).

3

3. The [plaintiff] does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, the [ALJ] finds the [plaintiff] has the following residual functional capacity: He can lift/carry up to 10 pounds frequently and 20 pounds occasionally; he has no restriction with regard to standing, walking, or sitting; he can occasionally stoop, kneel, crouch, crawl, and climb ramps or stairs; he should never climb ladders, ropes, or scaffolds and should not work at unprotected heights. Mentally, the [plaintiff] would have difficulty coping with a high stress environment; however, he is able to perform moderately complex tasks in a setting without strict production demands.

5. The [plaintiff] is unable to perform any past relevant work.[1]  (20 CFR 416.965).

6. The [plaintiff] was born [in] 1964 and was 39 years old, which is defined as a "younger individual age 18-49," on the date the application was filed (20 CFR 416.963).

8. The [plaintiff] has a "limited" education and is able to communicate in English (20 CFR 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the [plaintiff] is "not disabled," whether or not the [plaintiff] has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the [plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that he can perform (20 CFR 416.969 and 416.969(a)).[2]

11. The [plaintiff] has not been under a disability, as defined in the Social Security Act, since March 23, 2004, the date the application was protectively filed (20 CFR 416.920(g)), and continuing through the date of [the ALJ's] decision.

(Tr. 869-82).

---

[1] Plaintiff's past relevant work was as a jockey.  (Tr. 881).

[2] The ALJ relied on the VE's testimony to find that plaintiff could perform the requirements of representative occupations such as surveillance system monitor (125 regional jobs and 22,070 national jobs), inspector (100 regional jobs and 9,515 national jobs), and clerical worker (3,100 regional jobs and 432,380 national jobs).  (Tr. 26).

### C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers,* 582 F.3d at 651 (quoting *Bowen,* 478 F.3d at 746). *See also Wilson*, 378 F.3d at 545-46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

5

**D. Specific Errors**

The medical evidence of record is summarized in plaintiff's Statement of Errors submitted in this case (Doc. 14 at 4-6) and in the Statement of Errors plaintiff submitted in connection with the appeal of ALJ Jordan's decision denying plaintiff's first application for benefits (Doc. 14-1). The Court will not set forth all of the medical findings and opinions of record in full but will identify, where applicable, the medical evidence relevant to its decision.

On appeal, plaintiff alleges four assignments of error: (1) the ALJ demonstrated a biased approach to plaintiff's case and as a result of her bias did not fully and fairly weigh the evidence of record; (2) the ALJ failed to consider the combined effects of plaintiff's impairments; (3) the ALJ improperly weighed the medical opinions related to plaintiff's mental impairments; and (4) the ALJ erred by discounting the professional medical opinion of Dr. Daniel A. Capen, M.D., a non-examining spinal surgeon.

**1. Plaintiff has not proved bias and denial of a full and fair hearing.**

**a. Plaintiff's claim of bias**

Plaintiff alleges as his first assignment of error that: "The ALJ's biased approach to Plaintiff's case led her to fail to fairly weigh the evidence before her." (Doc. 14 at 13). This assignment of error is a catch-all claim that attributes bias to the ALJ based on her conduct during the ALJ hearing, statements she made in the written decision, and her assessment of the evidence. Plaintiff alleges that the ALJ's purportedly biased behavior and written statements denied him his due process right to a full and fair hearing, thereby requiring reversal of the ALJ's decision. (*Id*. at 16).

Plaintiff contends that the ALJ harbored a bias against him which pre-dated the ALJ hearing. (*Id*.). Plaintiff alleges that the ALJ disclosed her bias at the hearing and in her written

6

decision by expressing her belief at the ALJ hearing and in her decision that the case should not

have been remanded based on new and material evidence because plaintiff should have

submitted the evidence in question before ALJ Jordan issued his decision on the prior

application. (*Id*. at 14). Plaintiff contends the ALJ further demonstrated her bias by blaming

plaintiff's previous counsel for prolonging the case by obtaining new evidence after the prior

ALJ hearing. (*Id*.). In addition, the ALJ purportedly showed her bias by stating before the MEs

testified that she did not think the deposition testimony of plaintiff's treating psychiatrist, Dr.

Jonathan Rosenthal, M.D., was supported by his progress notes, which plaintiff alleges likely

colored the testifying physicians' view of the evidence. (*Id*. at 15, citing Tr. 1461-62). Plaintiff

further argues that the ALJ demonstrated bias by failing to question the MEs in a manner that

would elicit facts both favorable and unfavorable to plaintiff's claim, and specifically by posing

questions to the testifying psychological expert which "seemed" to focus on eliciting testimony

about evidence of drug-seeking behavior to the exclusion of substantive evidence which

supported plaintiff's disability. (*Id*. at 15-16, citing Tr. 1507-09).

In addition, plaintiff contends that the ALJ showed bias by "completely ignoring the

remand order" and applying the same reasoning for denying plaintiff's claim as ALJ Jordan

applied in his decision. (*Id*. at 16). Plaintiff alleges that the ALJ ignored the evidence that

shows plaintiff suffers from multiple impairments and which supports a finding that plaintiff is

disabled due to a combination of his impairments. Plaintiff alleges this includes evidence of

multiple elbow surgeries and history of radial head fracture in November 2006; bunions and

plantar fasciitis; arthritis of the hips; degenerative changes in his neck and thoracic spine; and

post-remand evidence regarding his lumbar impairments, including new evidence of clonus,

upgoing toes on Babinski testing, and hyperreflexia. (*Id*.).

Finally, plaintiff alleges that the ALJ ignored the possibility that his condition was worsening over time so that although he may not have been disabled as of his alleged onset date in 2003, he may have become disabled at some later date. (*Id.*). Plaintiff alleges that the ALJ's actions, taken as a whole, are similar to those of ALJs who have been found to have violated a claimant's due process rights by imposing undue limits on cross-examination or by continually harassing a plaintiff's attorney in order to accelerate the presentation of her case.[3]

The Commissioner argues that plaintiff has offered no credible evidence that the ALJ was biased against him. (Doc. 19 at 4-6). The Commissioner asserts that the ALJ afforded plaintiff a full and fair opportunity to present his claim by reviewing approximately 1,300 pages of medical records, calling two MEs and a VE to testify, giving plaintiff an opportunity to cross-examine the testifying MEs, and reviewing evidence that plaintiff submitted almost one month after the hearing. (*Id.*).

### b. A claimant's right to a full and fair hearing free of bias

The Sixth Circuit assumed in *Flatford v. Chater,* 93 F.3d 1296, 1304-05 (6th Cir. 1996), that an applicant for social security disability benefits has a property interest in those benefits that is protected by the Fifth Amendment. *Ferriell v. Comm'r of Soc. Sec.*, 614 F.3d 611, 620 (6th Cir. 2010). "At a minimum, the Due Process Clause requires that an individual is afforded notice and an opportunity to be heard before the deprivation of a protected interest through adjudication." *Mullane v. Cent. Hanover Bank & Trust Co.,* 339 U.S. 306, 313 (1950). Due process requires in the context of a social security hearing that the proceedings be "full and fair."

---

[3] In support of this proposition, plaintiff's counsel cites two cases in which the court purportedly found a due process violation: *McLaughlin v. Sec'y of Health, Ed. & Welfare of U.S.*, 612 F.2d 701, 704 (2d Cir. 1980) and *Rosa v. Bowen*, 793 F.2d 702 (D.C. N.J. 1988). No due process violation was found in *McLaughlin*, and counsel has supplied an incorrect cite for *Rosa*. Counsel presumably intended to cite *Rosa v. Bowen*, 677 F. Supp. 782 (D. N.J. 1988), where the district court held the plaintiff was denied her right to a fair hearing where the hearing "was shameful in its atmosphere of alternating indifference, personal musings, impatience and condescension." *Id.* at 783.

*Ferriell*, 614 F.3d at 620 (quoting *Flatford,* 93 F.3d at 1305 (quoting *Perales,* 402 U.S. at 401-02)).

In evaluating a claim of bias by a social security claimant, the court must start with the presumption that the ALJ exercised her decision-making power "with honesty and integrity." *See Collier v. Comm'r of Soc. Sec.*, 108 F. App'x 358, 363-64 (6th Cir. 2004) (citing *Navistar Int'l. Transportation Corp. v. U.S. E.P.A.,* 941 F.2d 1339, 1360 (6th Cir. 1991)). *See also Bailey v. Commissioner,* 413 F. App'x 853, 856 (6th Cir. 2011) ("We presume that judicial and quasijudicial officers, including ALJs, carry out their duties fairly and impartially"); *Carrelli v. Comm'r of Soc. Sec.*, 390 F. App'x 429, 436 (6th Cir. 2010) (presumption applies that policymakers exercise their decision-making power "with honesty and integrity."). "The burden of overcoming the presumption of impartiality 'rests on the party making the assertion [of bias],' and the presumption can be overcome only with convincing evidence that 'a risk of actual bias or prejudgment' is present." *Collier,* 108 F. App'x at 364 (citing *Schweiker v. McClure,* 456 U.S. 188, 196 (1982); *Withrow v. Larkin,* 421 U.S. 35, 47 (1975)). Bias on the part of the decision-maker must be apparent from the record and "cannot be based on speculation or inference." *Carrelli,* 390 F. App'x at 436 (citing *Navistar Int'l Transportation Corp.*, 941 F.2d at 1360). Further, a claim of bias must be supported by a "*strong showing*" of bad faith. *Id.* at 436-37 (quoting *City of Mount Clemens v. U.S. EPA,* 917 F.2d 908, 918 (6th Cir. 1990) (internal quotation marks omitted)) (emphasis in original).

"[E]xpressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women . . . sometimes display" are not sufficient to prove bias. *Liteky v. United States,* 510 U.S. 540, 555-56 (1994). Thus, the Sixth Circuit has found that an ALJ's "obvious frustration, emotional mannerisms and abruptness" were insufficient to

9

establish actual bias. *Collier*, 108 F. App'x at 364 (citing *Wells v. Apfel,* 234 F.3d 571 (table),

2000 WL 1562845, at *5 (6th Cir. Oct. 12, 2000)). Further, the Sixth Circuit in *Collier* upheld

the district court's finding in the case before it that the plaintiff failed to establish bias on the

ALJ's part where, although some of the ALJ's comments were both "unnecessary and

inappropriate," the hearing lasted one hour and forty minutes; the plaintiff was questioned on a

wide variety of matters; and helpful testimony was elicited relating to the plaintiff's education,

daily activities, treatment history, and symptoms. (*Id.*).

### c. Plaintiff has not carried his burden to establish bias.

Here, plaintiff has not shown that the ALJ harbored a bias that ultimately led to the denial

of plaintiff's due process right to a full and fair hearing. At the start of the ALJ hearing, the ALJ

reviewed the reasons for the remand by this Court. (Tr. 1459-60). The ALJ criticized prior

counsel's decision to obtain a statement from plaintiff's treating psychiatrist, Dr. Rosenthal, after

the first ALJ hearing, expressing her opinions that counsel could have obtained the evidence

prior to the hearing and that if attorneys consistently waited until after the ALJ hearing to obtain

additional evidence, the time required to adjudicate the cases would be prolonged unnecessarily.

(Tr. 1460-63). However, the ALJ stated that she would consider the additional evidence

pursuant to the district court's remand order. (Tr. 1461). The ALJ and present counsel then had

an exchange during which counsel stated that she "understood the concept" of problems with

delays if counsel in cases sought to introduce evidence after a hearing to refute testimony

presented at a hearing; however, counsel attempted to explain to the best of her understanding

the reason for prior counsel's submission of additional evidence. (Tr. 1462-64). The ALJ

eventually accepted counsel's explanation, although she expressed skepticism, stating: "Okay. I

mean I've read [Dr. Rosenthal's statement] over and over again but okay. All right. Okay.

Let's go to the second . . . issue from a legal standpoint then." (Tr. 1464). The hearing then proceeded.

The second issue was the ALJ's stated belief that there was an inconsistency between Dr. Rosenthal's opinion set forth in his deposition testimony that plaintiff would basically be unable to perform any work and Dr. Rosenthal's treatment records. (Tr. 1461). The ALJ explained the inconsistencies that she discerned. (Tr. 1464). Counsel pointed out portions of the record that she believed showed plaintiff had good days and bad days. (Tr. 1464-65).

In her decision, the ALJ twice noted that the new deposition testimony by Dr. Rosenthal, which was submitted after the hearing held by ALJ Jordan, could have been obtained prior to that hearing. (Tr. 871, 874). However, the ALJ stated that the deposition was nonetheless "considered and taken into account in arriving at the [ALJ's] decision as ordered by the District Court." (Tr. 874). A review of the ALJ's decision shows that the ALJ did consider the new evidence pursuant to the remand order. (Tr. 874-875).

A review of the ALJ's comments at the hearing and her written statements in the ALJ decision fails to disclose "convincing evidence of actual bias" against either plaintiff or his attorney as is necessary to overcome the presumption of impartiality. In fact, plaintiff's counsel acknowledged the ALJ's concern about the delayed submission of evidence as a general concept, and counsel sought to address the ALJ's questions about prior counsel's motivation for waiting until after the prior ALJ hearing to submit Dr. Rosenthal's report. (Tr. 1462-64). The ALJ no doubt demonstrated obvious frustration with prior counsel's failure to submit the evidence before the ALJ hearing and with the needless delay that the ALJ perceived to have resulted. (*Id.*). However, the back and forth with counsel was civil, and the ALJ's comments and written remarks, while unnecessary, are a far cry from the type of demeaning and discourteous conduct

that has been held to be indicative of bias such as would warrant remand of the case.  *See, e.g.,* *Wells,* No. 99-5548, 2000 WL 1562845, at *5.  *See also Rosa*, 677 F. Supp. at 783-85 (court found that the "ALJ's most pressing concern was expedience" and that the hearing was "shameful in its atmosphere of alternating indifference, personal musings, impatience and condescension").

Nor has plaintiff shown that an alleged bias on the part of the ALJ caused the ALJ to fail in her obligation to fully and fairly develop the record.  To the contrary, the ALJ fulfilled her obligation to "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts." *See Lashley v. Sec'y of Health & Human Servs.,* 708 F.2d 1048, 1052 (6th Cir. 1983).  The ALJ held a hearing that was nearly two hours in length during which she questioned plaintiff and solicited the testimony of two MEs and a VE. (Tr. 1457-1526).  The ALJ reviewed several hundred pages of medical records, and she considered evidence submitted by plaintiff's counsel subsequent to the hearing despite counsel's failure to submit a request to hold the record open or any other type of request for consideration of the evidence. (Tr. 872, 873).  The ALJ wrote an exhaustive opinion. (Tr. 867-83).  The ALJ's decision carefully discusses the record evidence and goes far beyond merely parroting the decision of ALJ Jordan.  There is no indication that the ALJ was somehow delinquent in her obligations to fully develop the record, either by failing to elicit evidence that was both favorable and unfavorable to plaintiff, by ignoring evidence that was favorable to plaintiff, by ignoring the possibility that plaintiff may have become disabled at some point after his alleged onset date, or by expressing concern about inconsistencies between Dr. Rosenthal's deposition and his treatment notes. *See Perschka v. Comm'r of Soc. Sec.*, 411 F. App'x 781, 788 (6th Cir. 2010) (ALJ fulfilled duty to fully and fairly develop the record where the ALJ held a hearing, reviewed several hundred pages of

medical records, and solicited VE testimony; the ALJ allowed counsel to take additional action

to introduce evidence following the hearing; and the ALJ's decision carefully discussed the

record evidence).

In short: "An objective observer, listening to the hearing as a whole, [and reading the

ALJ's written remarks], would not have been convinced from the conduct of the hearing that the

ALJ's fairness need be questioned." *See Collier*, 108 F. App'x at 364. While some of the

comments made by the ALJ as to the propriety of the remand by the district court were

unnecessary, the Court does not discern any basis on which to conclude that the ALJ was biased

in a manner which affected the outcome of the hearing. *Id.* Plaintiff's first assignment of error

should be overruled.

### 2. The ALJ properly considered the combined effect of plaintiff's impairments.

Plaintiff alleges as his second assignment of error that the ALJ erred by failing to

consider the combined effect of his impairments. (Doc. 14 at 17). Plaintiff alleges that the ALJ

"rel[ied] so heavily" on the testimony of the ME, Dr. Hershel Goren, M.D., who focused only on

plaintiff's back and left knee issues to the exclusion of other physical impairments, that the ALJ

failed to consider the combined effects of plaintiff's impairments on his RFC. (*Id.*, citing Tr.

1501-02). Plaintiff alleges that the following additional evidence supports a finding that he is

disabled due to the combination of his impairments: evidence of plaintiff's multiple elbow

surgeries and history of radial head fracture in November 2006 (Tr. 686); bunions and plantar

fasciitis (Tr. 653-655); arthritis of the hips (Tr. 487, 491, 1390, 1446); degenerative changes in

the neck and thoracic spine (Tr. 1423-25); and post-remand evidence pertaining to plaintiff's

lumbar impairment, including new evidence of clonus, "upgoing toes" on Babinski testing, and

hyperreflexia (Tr. 1287, 1420, 1422-26). (*Id.* at 17). Plaintiff further alleges that because the

psychologist who testified as an ME at the ALJ hearing, Dr. Terry Schwartz, Psy.D., addressed

only plaintiff's psychological impairments and did not discuss the negative impact of plaintiff's

medications and physical pain on his ability to pay attention, concentrate, and persist at

activities, "the ALJ cannot possibly have fully addressed Plaintiff's mental functional limitations

if she relied primarily on Dr. Schwartz's opinion." (*Id*. at 18). Finally, plaintiff alleges that the

ALJ erred by misstating the requirements of Listing 1.04. (*Id*. at 17).

In assessing a claim for disability, the ALJ must analyze "the combined effect of all of

the claimant's impairments without regard to whether any such impairment, if considered

separately, would be of sufficient severity to render the claimant disabled." *Walker v. Sec. of

HHS*, 980 F.2d 1066, 1071 (6th Cir. 1992). This does not mean the ALJ must employ a

particular "combined effects" analysis. *See Loy v. Sec. of HHS*, 901 F.2d 1306, 1310 (6th Cir.

1990). "[A]n ALJ's individual discussion of multiple impairments does not imply that [she]

failed to consider the effects of the impairments in combination, where the ALJ specifically

refers to a combination of impairments in finding that the plaintiff does not meet the listings."

*Id*. (citing *Gooch v. Secretary of HHS*, 833 F.2d 589, 592 (6th Cir.1987)).

Here, the ALJ discussed plaintiff's physical and mental impairments and included

exertional and nonexertional restrictions in her RFC finding. (Tr. 871). The ALJ also found

plaintiff did not have a "combination of impairments" that met or equaled a listed impairment.

(Tr. 870-71). The ALJ relied on Dr. Goren's findings related to plaintiff's back and left knee to

find plaintiff's physical impairments did not meet the pertinent musculoskeletal Listing. Plaintiff

does not explain how the additional findings in the record resulted in further limitations on his

ability to work. The record shows that plaintiff experienced a radial head fracture in November

2006 (Tr. 686), and the ALJ acknowledged that plaintiff reported a history of bilateral elbow

14

surgeries. (Tr. 870). However, Dr. Goren testified that there was not enough information in the record for him to "comment one way or the other" on any impairment related to plaintiff's elbows. (Tr. 1501-02). Plaintiff has not pointed to any evidence in the record that indicates he suffered any dysfunction or disabling symptoms related to an elbow impairment. Similarly, plaintiff cites records dated December 2006 to January 2007 related to complaints of painful feet and a diagnosis of plantar fasciitis and a bunion. (Tr. 653-55). However, plaintiff does not cite any evidence of a continuing and debilitating foot problem. Further, although the evidence includes findings of early degenerative disease of the hips in 2003 (Tr. 487, 491), these records do not include findings of debilitating pain or functional limitations. In fact, plaintiff's range of motion was noted to be "pretty good" as of 2003. (Tr. 487). Further, the ALJ did acknowledge plaintiff's hip complaints. (Tr. 879, citing Tr. 1446, 1448 - noting that although plaintiff had decreased range of motion in the left hip in January 2010 after a fall on the steps at a restaurant, he had full strength on abduction and adduction and when seen one week later, he had full range of motion of the hip). Plaintiff points to no additional evidence of functional limitations imposed by his hip impairment that the ALJ failed to consider when formulating the RFC. In addition, plaintiff alleges that the ALJ "failed to properly account" for post-remand evidence of plaintiff's lumbar impairment, including "new evidence of clonus, a response of upgoing toes on Babinski testing, and hyperreflexia.[4] (Doc. 14 at 17, citing Tr. 1287, 1420, 1422-26). However, the record shows the ALJ thoroughly evaluated the evidence of plaintiff's degenerative disc disease, including imaging findings and examination findings made by three neurosurgeons following the first ALJ hearing. (Tr. 872-873). Plaintiff has not pointed to evidence or evaluations showing that these isolated positive findings imposed additional limitations that the ALJ failed to include in the RFC.

---

[4] The clonus was actually noted to be an "old" problem that plaintiff had experienced since 2003. (Tr. 1420).

Plaintiff also argues that the "ALJ cannot possibly have fully addressed Plaintiff's mental functional limitations if she relied primarily on Dr. Schwartz's opinion" because Dr. Schwartz failed to address the interplay between plaintiff's psychological factors and physical impairments. (Doc. 14 at 18). Plaintiff's argument is both speculative and without support in the record. Plaintiff has not shown that the ALJ failed to fully address the evidence related to his mental functional limitations. Nor has plaintiff shown that substantial evidence supports additional functional mental limitations resulting from his medications and physical pain. The ALJ did not fail in her duty to consider plaintiff's impairments in combination by relying on Dr. Schwartz's testimony.

Finally, plaintiff's counsel states that, "ALJ Smith parroted Dr. Goren's testimony when she stated that Listing 1.04 requires reproducible evidence of neurological deficits over a prolonged period of time and not just isolated holdings." (Doc. 14 at 17). Counsel asserts that the Listing does not require abnormal physical findings in every physical examination. (*Id.*, citing Listing 1.00(D)). However, plaintiff's counsel does not address the requirements of Listing 1.04 and does not argue that plaintiff's impairment meets or equals Listing 1.04. Accordingly, the Court need not address any contention by plaintiff that the ALJ incorrectly stated the requirements of Listing 1.04. Further, as noted by the Commissioner, plaintiff has waived the issue of whether his impairments met or equaled the Listing by failing to raise the issue in the Statement of Errors. *See Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003) ("issues which are 'averted to in a perfunctory manner, unaccompanied by some effort at developed augmentation, are deemed waived'") (quoting *United States v. Elder*, 90 F.3d 1110, 1118 (6th Cir. 1996)).

16

In conclusion, plaintiff has not shown that the ALJ erred by failing to consider the combined effect of his impairments. The ALJ reasonably relied on the testimony of the MEs, who had reviewed the evidence of record, together with the ALJ's own review of the evidence to find that plaintiff was limited to light work with certain nonexertional restrictions as a result of his impairments. For these reasons, plaintiff's second assignment of error should be overruled.

**3. The ALJ properly weighed the medical opinions of record related to plaintiff's mental impairments.**

Plaintiff alleges as his third assignment of error that the ALJ improperly weighed the medical opinions of record related to his mental impairments.

It is well-established that the findings and opinions of treating physicians are entitled to substantial weight. "In general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530-31 (6th Cir. 1997). *See also Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference."). "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).

"Treating-source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20

17

C.F.R. § 404.1527(c)(2)). *See also Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). If the ALJ

declines to give a treating source's opinion controlling weight, the ALJ must balance the factors

set forth in 20 C.F.R. § 416.927(c)(2)-(6) in determining what weight to give the opinion. *See*

*Gayheart,* 710 F.3d at 376; *Wilson*, 378 F.3d at 544. These factors include the length, nature and

extent of the treatment relationship and the frequency of examination. 20 C.F.R. §

416.927(c)(2)(i)(ii); *Wilson*, 378 F.3d at 544. In addition, the ALJ must consider the medical

specialty of the source, how well-supported by evidence the opinion is, how consistent the

opinion is with the record as a whole, and other factors which tend to support or contradict the

opinion. 20 C.F.R. § 416.927(c)(3)-(6); *Gayheart,* 710 F.3d at 376; *Wilson*, 378 F.3d at 544.

"Importantly, the Commissioner imposes on its decision makers a clear duty to 'always

give good reasons in [the] notice of determination or decision for the weight [given a] treating

source's opinion.'" *Cole*, 661 F.3d at 937 (citing former 20 C.F.R. § 404.1527(d)(2)[5]). *See also*

*Wilson*, 378 F.3d at 544 (ALJ must give "good reasons" for the ultimate weight afforded the

treating physician opinion). Those reasons must be "supported by the evidence in the case

record, and must be sufficiently specific to make clear to any subsequent reviewers the weight

the adjudicator gave to the treating source's medical opinion and the reasons for that weight."

*Cole*, 661 F.3d at 937 (citing SSR 96-2p).

Here, the ALJ included as part of the RFC a finding that plaintiff "would have difficulty

coping with a high stress environment; however, he is able to perform moderately complex tasks

in a setting without strict production demands." (Tr. 871). In formulating the RFC, ALJ Smith

considered the January 18, 2007 deposition testimony of Dr. Rosenthal as instructed by the

district court's remand order, as well as Dr. Rosenthal's treatment notes. (Tr. 874-76). In his

---

[5] Title 20 C.F.R. § 404.1527 was amended effective March 26, 2012. The provision governing the weight to be afforded a medical opinion that was previously found at § 404.1527(d) is now found at § 404.1527(c).

deposition, Dr. Rosenthal testified that plaintiff had been a patient of Core Behavioral since 2003 and that Dr. Rosenthal had seen plaintiff approximately once a month beginning May 30, 2006. (Tr. 714-15). Dr. Rosenthal stated that plaintiff was "very compliant" with treatment in that he had not missed appointments and he had faithfully adhered to his medication regimen while Dr. Rosenthal and plaintiff worked to adjust it. (Tr. 716). Dr. Rosenthal expanded on opinions he had provided in a pre-hearing RFC assessment as follows: plaintiff would have poor or no ability to deal with work stresses because of both mental and physical impairments; *i.e.*, "he cannot sit or stand in one place for a long time" because of chronic pain, and "[h]is mind tends to run a little quicker than most people so his concentration gets impaired because of that also." (Tr. 715). Plaintiff would experience frequent, unscheduled interruptions during the work day as a result of both psychological and physical impairments because he tends to be "rather tense and anxious"; his concentration is impaired because "his mind is sped up at times"; and pains would interrupt him and distract him from being able to concentrate on anything. (Tr. 716). Plaintiff's intrusive thinking had improved somewhat. (*Id.*). Plaintiff would not be able to sustain work activities five days a week, eight hours a day because "he can't be counted on from day to day, let alone from even hour to hour to be able to consistently perform and stay at a task and concentrate on it both from the ability of his mind to stay focused and being interrupted by pains." (*Id.*). From a "purely psychological standpoint," plaintiff could persist in a simple one and two step job in possibly six to twelve months' time, but at the present and for the foreseeable future, Dr. Rosenthal opined plaintiff had too many physical and emotional issues to do so. (Tr. 716-17). Plaintiff could not relate to co-workers, supervisors and the public on a sustained basis. (Tr. 717). Dr. Rosenthal stated his observations were consistent with plaintiff's testimony at the first ALJ hearing that he experienced mood swings about three times per week. (Tr. 717). Dr.

Rosenthal would rate plaintiff's bipolar condition as "6" on a scale of 1 to 10 due to pressured speech where plaintiff will start on one topic and then go off on tangents, and issues which interfere with his ability to concentrate, including his physical, mental, dental and social issues; racing thoughts that occur sometimes and which "are almost faster than he can talk"; and sleep disturbance. (*Id.*). Plaintiff's short term memory is moderately impaired due to his racing thoughts and outside pressures of life, including dealing with his son. (Tr. 718). Plaintiff would be unable to function in a stressful situation or one where he is required to meet production quotas because he is not consistently predictable from hour to hour and day to day. (Tr. 717). At most, plaintiff would be able to work in a sheltered workshop where he would be able to take breaks of variable time periods whenever necessary. (Tr. 718). Plaintiff is incapable of performing any sustained gainful employment due to his physical, mental and dental problems. (*Id.*). When questioned as to whether it was possible to separate plaintiff's chronic pain condition from his underlying psychiatric problems, Dr. Rosenthal's response indicated that the symptomatology of both was very similar. (*Id.*).

The ALJ declined to give Dr. Rosenthal's opinion controlling weight. (Tr. 875). The ALJ provided a number of reasons for her decision. (*Id.*). The ALJ found that the severe functional limitations Dr. Rosenthal described in his deposition were inconsistent with the moderate degree of impairment Dr. Rosenthal described in his treatment notes. (Tr. 874). In addition, although Dr. Rosenthal had initially diagnosed plaintiff with both bipolar disorder and alcohol dependence, Dr. Rosenthal made no mention of a history of substance abuse problems in his deposition. (Tr. 874). The ALJ also found that Dr. Rosenthal's deposition testimony indicating severe functional limitations was inconsistent with the opinions of other mental health sources, who indicated that plaintiff suffered from only moderate symptoms. (Tr. 875).

Moreover, the ALJ discounted Dr. Rosenthal's deposition testimony because Dr. Rosenthal repeatedly attributed plaintiff's psychological symptoms, including racing thoughts, poor concentration, inability to stay focused, and impaired short-term memory, in part to physical, social and dental issues that are outside Dr. Rosenthal's area of treatment. (*Id*.). In addition, the ALJ questioned Dr. Rosenthal's opinion that plaintiff had been very compliant with his medication and the adjustments in the medication regimen given (1) Dr. Rosenthal's opinion that plaintiff was unable to concentrate on anything from day to day and hour to hour, and (2) Dr. Rosenthal's apparent lack of awareness of plaintiff's drug-seeking behavior and prescription drug abuse as demonstrated by inconsistencies on a toxicology screen, as well as plaintiff's marijuana use. (*Id*., citing Tr. 1439-54). Finally, the ALJ relied on reports by plaintiff's treating pain management specialist, Dr. John Beresh, M.D., that plaintiff had returned to working with horses and managing a barn to discount Dr. Rosenthal's testimony, finding the reports indicated a "much higher level of functioning than set forth by Dr. Rosenthal." (*Id*., citing Tr. 1439-54).

Plaintiff alleges that the ALJ's reasons for rejecting the RFC assessment of plaintiff's treating psychiatrist, Dr. Rosenthal, are not supported by substantial evidence. (Doc. 14 at 18). Some of counsel's arguments are difficult to follow, but counsel appears to allege that the ALJ repeated errors made by ALJ Jordan in the prior opinion by: (1) rejecting Dr. Rosenthal's assessment based on the number of times Dr. Rosenthal had treated plaintiff (*Id*. at 18-19); and (2) failing to acknowledge that Dr. Rosenthal's opinion that plaintiff "has certain disabling functional limitations in a work setting" is not inconsistent with Dr. Rosenthal's treatment notes indicating that plaintiff has only "'moderate' limitations in his day-to-day life. . . ." (*Id*. at 19). Plaintiff alleges that Dr. Rosenthal's January 2007 deposition testimony provides "even more explanation of this supposed discrepancy" and explains that "the interplay of pain with Plaintiff's

underlying anxiety 'only serves to worsen his attention and concentration.'" (*Id*., citing Tr. 715, 717). Plaintiff argues that the ALJ erred by failing to give weight to Dr. Rosenthal because the psychiatrist's opinion that plaintiff has problems with anxiety and concentration is consistent with the observations of every treating mental health provider of record; with the objective findings contained in the treatment notes from Core Behavioral; and with the mental health assessments issued by other providers at Core Behavioral. (*Id*. at 20). Plaintiff also argues that the ALJ erred by relying on "Dr. Schwartz's reviewing physician testimony to uphold ALJ Jordan's decision" because Dr. Schwartz's testimony was not reliable. Plaintiff contends that Dr. Schwartz testified about inconsistencies between the severe functional limitations described in Dr. Rosenthal's deposition testimony and the moderate degree of impairment described in his treatment notes, despite admitting at the prior hearing before ALJ Jordan that Dr. Schwartz did not know the meaning of the term "moderate" as used in Dr. Rosenthal's pre-hearing RFC report. (*Id*. at 21). Finally, plaintiff claims that the ALJ erred by discounting Dr. Rosenthal's opinion based on his failure to mention substance abuse as an issue during his deposition testimony because plaintiff contends there is no conclusive evidence of ongoing alcohol abuse. (*Id*. at 21-22).

The record demonstrates that the ALJ reasonably discounted the opinion of plaintiff's treating psychiatrist. The ALJ gave "good reasons" for giving less than controlling weight to Dr. Rosenthal's opinion and instead adopting the opinions of the consultative examining psychiatrist, Dr. Kevin Eggerman, M.D., and the ME, Dr. Schwartz, and those reasons are substantially supported by the record.

First, the ALJ reasonably determined that the severe functional limitations imposed by Dr. Rosenthal were not consistent with Dr. Rosenthal's own treatment notes. The ALJ was

entitled to rely on the testimony of the ME, Dr. Schwartz, to find that the severe functional

limitations Dr. Rosenthal assessed in his deposition testimony were inconsistent with Dr.

Rosenthal's treatment notes. (Tr. 874, citing Tr. 1507-08). Rather, the ALJ reasonably

determined that according to Dr. Rosenthal's treatment notes, plaintiff experienced only

moderate symptoms. Dr. Rosenthal's treatment notes include a progress note for each of

plaintiff's visits which assessed plaintiff's "Overall Functioning" based on a number scale where

"0" equaled "poor functioning," "5" equaled "moderate" functioning, and "10" was the "best"

level of functioning. (*See, e.g.*, Tr. 641). In the progress notes for numerous visits between May

30, 2006 and June 4, 2007, and in an Individual Service Plan (ISP) on which he signed off, Dr.

Rosenthal consistently rated plaintiff's level of functioning as "5" or "6", which was in the

"moderate" range. (Tr. 641, 643, 657, 659, 661, 1339, 1341, 1343, 1345, 1349). Dr. Rosenthal's

written comments in the progress notes likewise indicate that plaintiff had no more than

moderate limitations. (*See, e.g.*, Tr. 1344-45, 3/13/07- "less tense[,] sticks to topic better";

"calmer"; Tr. 1342-43, 4/5/07- "relates well [and] sticks to topic"; "relatively stable mood [and]

behavior"; Tr. 1338-39, 6/14/07- same). Further, in the June 2007 ISP, Dr. Rosenthal assessed a

GAF[6] score of 55 both currently and for the past year, which indicates only moderate symptoms

or moderate difficulty in social and occupational functioning. (Tr. 1352). The ALJ was entitled

to rely on these assessments by Dr. Rosenthal and on Dr. Schwartz's testimony to find Dr.

Rosenthal's opinion that plaintiff suffers from severe, disabling functional mental limitations to

---

[6]A GAF score represents "the clinician's judgment of the individual's overall level of functioning." American
Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed., text rev. 2000). The
GAF score is taken from the GAF scale, which "is to be rated with respect only to psychological, social, and
occupational functioning." *Id*. The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of
severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act
with clear expectation of death). *Id*. at 34. The DSM-IV categorizes individuals with scores of 51-60 as having
"moderate" symptoms. *Id*.

be inconsistent with Dr. Rosenthal's own treatment notes showing a moderate degree of impairment.

Substantial evidence likewise supports the ALJ's determination that the severe functional limitations imposed by Dr. Rosenthal were not consistent with the other medical evidence of record. The contrary medical evidence includes the opinions of (1) consultative examining psychiatrist Dr. Eggerman[7], (2) state agency reviewing psychologist, Dr. Douglas Pawlarczyk, Ph.D. (Tr. 1184), and (3) Dr. Schwartz. (Tr. 1505-18). Dr. Schwartz testified that Dr. Rosenthal's deposition testimony was not consistent with the notes of the consultative examining psychiatrist, Dr. Eggerman, and with numerous other evaluations showing the same moderate level of severity. (Tr. 1509). Dr. Schwartz testified that he agreed with Dr. Eggerman's assessment that plaintiff's ability to understand and remember short, simple instructions was not impaired; his ability to understand and remember detailed instructions was mildly limited; his ability to make judgments on simple work related tasks was minimally limited; his ability to interact appropriately with others was only mildly limited; his ability to respond appropriately in the work place was moderately limited; and his ability to respond appropriately to changes in a routine work setting was mildly limited. (Tr. 1510). Dr. Pawlarczyk gave weight to Dr. Eggerman's opinion that plaintiff's ability to understand and carry out simple tasks was not impaired; his ability to concentrate was intact; and his ability to tolerate the stress of work was moderately impaired. (Tr. 1184). Dr. Pawlarczyk concluded that the evidence suggested plaintiff would have difficulty coping with a high stress environment, but he is able to perform moderately complex tasks in a setting without strict production demands.

---

[7] It appears that several pages of Dr. Eggerman's report, including the portion of his report that sets forth the limitations cited by the ALJ, are missing from the record. (*See* Tr. 1161-1164, Exh. 33F/1-33F/4). Transcript pages 1165-1167 are not in the record, and Exhibit 33 consists of only 4 pages. However, the limitations assessed by Dr. Eggerman are cited by other medical sources in the record.

(*Id*.). The ALJ reasonably considered these medical opinions and found they did not support Dr.

Rosenthal's assessment. These medical opinions provide substantial support for the ALJ's RFC

finding that plaintiff would have difficulty coping with a high stress environment, but he is able

to perform moderately complex tasks in a setting without strict production demands. *See*

*Hoskins v. Comm'r of Soc. Sec.,* 106 F. App. 412, 415 (6th Cir. 2004) ("State agency medical

consultants are considered experts and their opinions may be entitled to greater weight if their

opinions are supported by the evidence.").

     In discounting Dr. Rosenthal's opinion as to plaintiff's level of mental functioning, the

ALJ also reasonably considered plaintiff's self-reports of daily and work activities and

determined they were "suggestive of a much higher level of functioning" than found by Dr.

Rosenthal. (Tr. 875). *See Warner v. Comm'r of Soc. Sec.,* 375 F.3d 387, 392 (6th Cir. 2004)

(permitting an ALJ to consider daily activities such as housework and social activities in

evaluating complaints of disabling pain). *See also* 20 C.F.R. § 416.929(c)(3)(i) (authorizing an

ALJ to consider activities when evaluating pain and functional limitations). The treatment notes

of Dr. Beresh, plaintiff's treating pain management specialist, indicate that beginning in April

2009 and continuing through September 2009, plaintiff was "working with horses again" and

"managing the barn." (Tr. 1397, 1399, 1400, 1402, 1403, 1404, 1406). Plaintiff reported on

August 25, 2009, that he was "able to work with minimal restrictions." (Tr. 1400). Dr. Beresh's

treatment note of June 8, 2009, states that plaintiff was tolerating his medications well; he was

"happy with [his] care"; he was able to "do all [activities of daily living]"; and "his [medications]

allow him to be active and work [full-time]." (Tr. 1404). Further, it was noted that the next

follow up was to be early because plaintiff was going to Saratoga Springs, a horse track. (*Id*.).

Additional records covering the period from October 2009 to March 2010, which were submitted

25

after the ALJ hearing by plaintiff's counsel, continue to indicate that plaintiff was "working with horses again, managing the barn" (Tr. 1445, 1447, 1449, 1451, 1452), and with his medications he was "able to work [full-time]." (Tr. 1450). These treatment notes substantially support a finding that plaintiff's mental limitations were not as severely limiting as opined by Dr. Rosenthal and support the ALJ's decision to give less than controlling weight to Dr. Rosenthal's opinions that plaintiff suffered from debilitating mental symptoms.

Finally, plaintiff faults the ALJ for discounting Dr. Rosenthal's opinion based on the psychiatrist's failure to mention plaintiff's history of alcohol abuse in his deposition. (Tr. 875). Counsel appears to argue that because plaintiff did not use alcohol during the time period Dr. Rosenthal treated him, it was not necessary for Dr. Rosenthal to comment on the condition. (Doc. 14 at 21-22). However, Dr. Schwartz testified that Dr. Rosenthal's deposition was inconsistent with his treatment notes because Dr. Rosenthal had earlier diagnosed polysubstance abuse and dependency, which was an ongoing problem even if it was in remission; yet Dr. Rosenthal made no mention of the condition in his deposition. (Tr. 1507-08, 1510-11). Rather, when asked at the deposition to provide plaintiff's diagnosis, Dr. Rosenthal listed only bipolar disorder in response. (Tr. 715). Plaintiff has not shown that the ALJ erred by discounting Dr. Rosenthal's opinion for failing to include a history of substance abuse in plaintiff's diagnosis, which suggested a lack of full knowledge of plaintiff's mental impairments.

The record therefore demonstrates that the ALJ did not err by adopting the opinions of Drs. Eggerman, Pawlarczyk and Schwartz instead of the opinion of plaintiff's treating psychiatrist, Dr. Rosenthal. *See Hoskins,* 106 F. App'x at 415. Substantial evidence supports the ALJ's decision to reject Dr. Rosenthal's opinion. To the extent plaintiff argues that the ALJ erred because there is evidence in the record which supports a finding of disability, plaintiff's

argument is unavailing. *See Buxton v. Halter,* 246 F.3d 762, 772 (6th Cir. 2001). The ALJ was

not bound to adopt the opinions of other "treating sources" identified by plaintiff, including

Nurse Practitioner Sue Wheeler, Dr. Melinda Nieman, M.D., and Dr. Jane Blinzler, M.D.,

plaintiff's internist, for the same reasons stated by this Court in connection with the remand of

this case.[8] (Tr. 940-41). It is the Commissioner's function to resolve conflicts in the medical

evidence, *see Hardaway v. Sec'y of Health & Human Servs.,* 823 F.2d 922, 928 (6th Cir. 1987),

which is precisely what the ALJ did in this case. The shared opinion of Drs. Eggerman,

Pawlarczyk and Schwartz that plaintiff had only mild to moderate limitations, together with the

conclusion of Drs. Pawlarczyk and Schwartz that plaintiff would have difficulty coping with a

high stress environment but is able to perform moderately complex tasks in a setting without

strict production demands, is supported by the objective medical evidence of record and

constitutes substantial evidence in this case.

For these reasons, plaintiff's third assignment of error should be overruled.

**4. The ALJ did not err in weighing Dr. Capen's opinion.**

Plaintiff contends that the ALJ erred by improperly discounting the professional opinion

of non-examining physician Dr. Daniel A. Capen, M.D. (Tr. 1428-1431), which the ALJ rejected

because Dr. Capen recommended lumbar fusion surgery based on imaging studies he reviewed

without ever personally examining plaintiff. (Doc. 14 at 22, citing Tr. 872). Plaintiff alleges the

ALJ erred because "it is a generally accepted medical practice for a spinal surgeon to review

imaging studies and make a decision about whether surgery is warranted." (*Id.*, citing Tr. 873).

Plaintiff alleges that the ALJ further erred by declining to proffer Dr. Capen's RFC assessment to

---

[8] In the Statement of Errors, plaintiff also identifies Dr. David Fallat, M.D., as one of his treating psychiatrists or mental health counselors. (Doc. 14 at 20). It appears Dr. Fallat saw plaintiff a handful of times in 2004. (Tr. 178-97). The record includes a few cryptic notes and no functional assessment by Dr. Fallat. (Tr. 178-182). Thus, the ALJ did not err by failing to take any opinions of Dr. Fallat into account.

the ME simply because the ALJ determined it was unsupported (Tr. 873) (*Id.* at 22-23). Plaintiff alleges that by failing to obtain a medical advisor's opinion as to whether Dr. Capen's opinion was reliable, ALJ Smith improperly placed herself in the position of a doctor. (*Id.* at 22).

Plaintiff further alleges that the ALJ erred by relying on recommendations against surgery by physicians with whom plaintiff consulted at Mayfield Clinic - Drs. A. Lee Greiner, M.D., Paul Cohen, M.D., and Charles Kuntz, M.D. - to support a finding of nondisability. (*Id.* at 22). Plaintiff contends that these physicians recommended against surgery not because his degenerative disc disease was mild in nature, but because his disease was present at many levels and surgery was therefore unlikely to be successful. (*Id.*). Plaintiff contends that the ALJ misstated Dr. Greiner's report by pointing out that Dr. Greiner did not recommend surgical intervention because there was "no gross instability or entrapment" (Tr. 872), when Dr. Greiner actually stated that surgery would be ineffective in controlling plaintiff's chronic pain. (*Id.* at 23, citing Tr. 872, citing Tr. 728). Plaintiff also asserts that the ALJ overlooked Dr. Greiner's opinion that plaintiff was permanently disabled from employment due to his injury and education level, which plaintiff alleges is "yet another example of ALJ Smith's biased review of the record." (*Id.*, citing Tr. 728, 1103).

Dr. Capen reviewed MRI and CT imaging studies of plaintiff's lumbar spine and prepared an opinion dated August 26, 2008. (Tr. 1428-1431). Dr. Capen diagnosed plaintiff with discopathy at L4-5 and L5-S1 and spondylosis at L5-S1. (Tr. 1430). Dr. Capen reported he had seen plaintiff's scan several years earlier and that plaintiff had "steadily progressively worsened with back pain." (*Id.*). Dr. Capen opined that plaintiff had "suffered an injury that has left dysfunction, disability and chronic pain" and that all conservative methods had failed. (*Id.*). Dr. Capen stated that he had spoken with plaintiff by telephone and plaintiff wanted to proceed

with surgery. (Tr. 1431). Dr. Capen requested authorization to perform a lumbar fusion at L4-5 and L5-S1. (*Id*.). Dr. Capen subsequently completed a physical RFC assessment on January 6, 2009, in which he reported that the frequency and length of contact with plaintiff was three years; the diagnosis was severe spinal discopathy; plaintiff's prognosis was guarded; his symptoms were spine pain and leg weakness; the clinical findings and objective signs were spine spasm and motion loss; plaintiff needed spine surgery; depression contributed to plaintiff's symptoms; plaintiff's pain would constantly interfere with the attention and concentration needed to perform even simple tasks; and plaintiff was incapable of even low stress jobs. (Tr. 1433-36). Dr. Capen further opined that plaintiff could walk 1-2 city blocks without rest or severe pain; he could sit for 5 minutes at one time before needing to get up; he could stand for ten minutes at one time; and he could sit and stand/walk less than 2 hours in an 8-hour working day. (Tr. 1436). Dr. Capen opined that plaintiff could not work because of severe pain. (*Id*., 1434, 1438).

The ALJ gave Dr. Capen's opinion "little weight" and decided not to proffer the opinion, which was submitted after the ALJ hearing, to the ME for his review. (Tr. 872, 1427). The ALJ discounted Dr. Capen's opinion because there was no evidence Dr. Capen had ever personally examined or treated plaintiff; Dr. Capen offered no specific findings in support of his opinion; Dr. Capen relied on plaintiff's subjective complaints in formulating the RFC, despite plaintiff's drug-seeking behavior and other evidence indicating that plaintiff's complaints were not fully credible; and other examining physicians had not recommended surgery. (*Id*.).

The ALJ gave "good reasons" for discounting Dr. Capen's opinion, and those reasons are substantially supported by the evidence of record. Even though Dr. Capen claimed to have had contact with plaintiff for over three years as of the date he completed the RFC assessment (Tr.

1434), there were no treatment or other notes by Dr. Capen in the record to show Dr. Capen had

treated plaintiff during that time period, and no other indication that Dr. Capen had ever

personally examined or treated plaintiff. In addition, Dr. Capen's assessment was not supported

by specific physical findings. Rather, in formulating the RFC assessment, Dr. Capen apparently

relied exclusively on plaintiff's subjective complaints, which he appears to have accepted

without question. The ALJ reasonably questioned the credibility of those complaints in light of

plaintiff's history of drug-seeking behavior,[9] of which Dr. Capen was seemingly unaware, and

plaintiff's conflicting representations about work attempts following the onset date as reflected in

Dr. Beresh's records. (Tr. 873). Further, the extreme limitations imposed by Dr. Capen, which

precluded plaintiff from sitting or walking for any sustained period of time or performing any

other sustained work activity, were inconsistent with plaintiff's activities of daily living and the

work activities plaintiff reported to Dr. Beresh as discussed in connection with plaintiff's third

assignment of error.

In addition, Dr. Capen's opinion as to the propriety of surgery and his RFC assessment

are neither consistent with, nor supported by, the reports of the examining physicians at Mayfield

Clinic, none of whom opined that surgery was appropriate. Dr. Greiner recommended against

surgery during his initial evaluation of plaintiff in April 2007 because there was "no gross

instability or entrapment" such as would warrant surgery.[10] (Tr. 728). When plaintiff was

evaluated by Dr. Cohen in June 2008, Dr. Cohen reviewed MRI results from December 2006 and

June 2008 and found "some degenerative changes which are not overwhelming in nature." (Tr.

---

[9] The ALJ thoroughly reviewed the extensive evidence of plaintiff's drug-seeking behavior at Tr. 877-79, 880.

[10] Plaintiff correctly notes that Dr. Greiner also stated that plaintiff was "disabled from employment at this time and into the future due to a combination of injury and education level." (Tr. 728). However, whether a person is disabled within the meaning of the Social Security Act is an issue reserved to the Commissioner, and a physician's opinion that his patient is disabled is not "giv[en] any special significance." 20 C.F.R. § 416.927(d)(1). *See Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) ("The determination of disability is ultimately the prerogative of the Commissioner, not the treating physician.") (citation and brackets omitted). Thus, the ALJ's failure to acknowledge Dr. Greiner's opinion of disability is not error.

1281). Straight leg raising produced only back pain, plaintiff had 5/5 strength throughout, and reflexes were brisk. (Tr. 1280). Plaintiff had some decreased sensation in the right foot, but his station and gait were normal. (Tr. 1279-80). Dr. Cohen found that plaintiff's symptoms were localized to the SI nerve root on the right without significant objective findings, and the objective exam would localize the problem "slightly better to the L4 nerve root." (Tr. 1281). Dr. Cohen opined that any surgical procedure was unlikely to improve plaintiff's symptoms and instead would actually make the problem worse. (*Id*.). Dr. Cohen reviewed the results of a discogram in July 2008 but did not recommend surgery based on the results. (Tr. 1273). Dr. Kuntz likewise declined to recommend a lumbar fusion in February of 2009. (Tr. 1287-88). Dr. Kuntz reviewed MRIs of the cervical, thoracic and lumbar spines from 2009 and a CT scan of the lumbar spine from 2008. He found evidence of multilevel segmental degenerative disease throughout the lumbar spine with the most severe degeneration at the L4-5 and L5-S1 levels. (Tr. 1287). On examination, plaintiff had 4+/5 strength in the lower extremities with normal muscle bulk and tone, and his gait was steady. (*Id*.). Sensation was mildly decreased to light touch but was otherwise intact. (*Id*.). Dr. Kuntz explained to plaintiff that treatment with fusion would not significantly improve his pain levels. (Tr. 1288). Dr. Kuntz advised plaintiff that he had multilevel degenerative disease throughout his axial spine and would likely always have "some level of back pain." (Tr. 1288).

In light of these opinions of record, the ALJ properly evaluated Dr. Capen's opinions in accordance with the regulatory factors and reasonably decided to accord Dr. Capen's opinions "little weight." The ALJ was not required to proffer Dr. Capen's opinions to the ME who testified at the ALJ hearing, Dr. Herschel Goren, M.D., in order to determine whether Dr. Capen's opinions should be credited. The Social Security regulations vest the ALJ with

responsibility "for reviewing the evidence and making findings of fact and conclusions of law."

20 C.F.R. § 416.927(e)(2).  The ALJ thoroughly reviewed the evidence of record and gave "good

reasons" which are substantially supported by the record for discounting Dr. Capen's opinions.

For these reasons, plaintiff's fourth assignment of error should be overruled.

**IT IS THEREFORE RECOMMENDED THAT:**

The decision of the Commissioner be AFFIRMED and this matter be CLOSED on the

docket of the Court.

Date: _12/17/13_

Karen L. Litkovitz
United States Magistrate Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

TYRONE STURGEON,                                    Case No. 1:12-cv-833
        Plaintiff,                                  Beckwith, J.
                                                    Litkovitz, M.J.

        vs.

COMMISSIONER OF
SOCIAL SECURITY,
        Defendant.

**NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R**

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of

the recommended disposition, a party may serve and file specific written objections to the

proposed findings and recommendations. This period may be extended further by the Court on

timely motion for an extension. Such objections shall specify the portions of the Report objected

to and shall be accompanied by a memorandum of law in support of the objections. If the Report

and Recommendation is based in whole or in part upon matters occurring on the record at an oral

hearing, the objecting party shall promptly arrange for the transcription of the record, or such

portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the

assigned District Judge otherwise directs. A party may respond to another party's objections

**WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in

accordance with this procedure may forfeit rights on appeal. *See Thomas* v. *Arn,* 474 U.S. 140

(1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).